UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

RICHARD COUSIN AND BECKY COUSIN
BOTH INDIVIDUALLY AND ON BEHALF
OF THEIR MINOR CHILDREN, NICHOLAS
COUSIN AND ALEX COUSIN

CIVIL ACTION

VERSUS

NO. 07-576-BAJ-DLD

RIVER WEST, L.P. D/B/A RIVER WEST
MEDICAL CENTER

**MEMORANDUM RULING**

The trial of this matter was held on March 25, 2013 in the Middle District Court of Louisiana. After consideration of the testimony, evidence, argument of counsel[1] and applicable law, the Court makes the following findings of fact and conclusions of law:

---

[1] The Court notes that River West L.P. no longer exists as a corporate entity and was not present at trial of this matter. The Liquidating Agent for the River West, L.P. Liquidating Trust filed a notice of Waiver of Appearance and declined to participate in this matter (doc. 54). The following is the procedural history of the case:

> (1) On February 6, 2009, an Involuntary Petition for Chapter 11 Bankruptcy was filed in the United States Bankruptcy Court, Middle District of Louisiana, bearing case number 09-10146, and entitled "In Re: River West, LP," naming River West as the debtor in bankruptcy. As a result, an automatic stay was imposed by the Bankruptcy Court pursuant to 11 U.S.C.A. §362, staying all proceedings against the estate of the debtor, River West;
>
> (2) On March 2, 2009, the bankruptcy court stayed and administratively terminated this action without prejudice to the right of the parties to reopen the proceedings (07-00576; doc. 27);
>
> (3) On November 18, 2009, Plaintiffs moved the bankruptcy court for relief from the automatic stay, and to permit them to continue the litigation and proceed to trial and judgment against Defendant herein, River West, L.P.;
>
> (4) On December 3, 2009, the bankruptcy court granted Plaintiffs' motion and issued an

1

## FINDINGS OF FACT

1. On September 7, 2004, Richard Cousin injured his shoulder and chest at his job at Cane Equipment Cooperative Inc (Cane Equipment). Mr. Cousin was employed as a Diesel Mechanic and remains employed by Cane Equipment.

2. On September 7, 2004, Richard Cousin went to the River West Medical Center emergency room.

3. Richard Cousin had no open wounds on his person when he appeared at the River West Medical Center emergency room. Richard Cousin did not report any other injuries to any other parts of his body besides his shoulder and chest.

5. Richard Cousin was treated by Dr. Jon Cuba at the River West Medical Center. Mr. Cousin appeared to have injured his rotator cuff.

6. Dr. Cuba discharged Richard Cousin on September 7, 2004 after ordering that he receive three injections. Richard Cousin's injections were performed by Pat Hill, Registered Nurse (R.N.). Prior to the incident in question, Mr. Cousin had never suffered from a staph infection or any of its debilitating effects.

---

order modifying the automatic stay, authorizing Plaintiffs to prosecute the suit to final judgment in this proceeding;

(5) The bankruptcy court further ordered that Plaintiffs may pursue payment of the claim from the Louisiana Patient's Compensation Fund (PCF), consistent with the PCF's liability under the Louisiana Medical Malpractice Act, La. R.S. 40:1299:41, et seq., should they prevail in this litigation (07-00576; doc. 28-1, Ex. A).

7. Mr. Cousin testified that the next day he returned to work with his arm in a sling. Upon arriving home that evening and bathing, he exited the tub and felt a pain in his right side shoulder. Richard Cousin was told by River West that if he had any more complications to follow up with his family doctor.

8. Mr. Cousin visited his family physician, Dr. Glenn Schexnayder, the next morning and explained his shoulder injury to the doctor. Dr. Schexnayder prescribed a strong pain medication and instructed Mr. Cousin to go home and get rest. The next morning, Mr. Cousin complained of pain radiating to the center of his chest. Mr. Cousin visited Dr. Schexnayder a second time complaining of more pain. Dr. Schexnayder prescribed stronger pain medication.

9. The subsequent morning, Mr. Cousin complained of pain radiating down his leg and stated that his knee and ankle were swollen. Mr. Cousin visited Dr. Schexnayder a third time and was prescribed an even stronger pain medication. At that time, Dr. Schexnayder arranged for Mr. Cousin to see a specialist. However, due to a hurricane,[2] Mr. Cousin was unable to see the specialist. Mr. Cousin visited Dr. Schexnayder a fourth time, and he was given a still stronger pain medication.

---

[2] Plaintiff avers that he was unable to see a specialist at that time due to Hurricane Ivan which was a large, long-lived, hurricane that caused widespread damage in the Caribbean and United States. The storm formed September 2, 2004 and dissipated September 24, 2004. Louisiana was among the states affected by the storm.

10. Several days after receiving the injections in his hip, Richard Cousin began to experience severe pain in his chest, legs, and knees. He also testified that he was nauseated and was having difficulty breathing and walking. Richard Cousin developed inflammation at the site of the injection and a rash developed on his legs. His wife, Becky Cousin, saw a rash on Richard Cousin's legs and a wound the size of a baseball at the site of the injection. Becky Cousin touched Richard Cousin's injections site and it was warm to the touch. Mr. Cousin proclaimed to Becky Cousin that he thought he was dying.

11. On September 20, 2004, Becky Cousin drove Mr. Cousin to Our Lady of the Lake Regional Medical Center where he was admitted. The doctors at Our Lady of the Lake determined that Mr. Cousin required a spinal tap and he was admitted into the intensive care unit (ICU). At one point, Becky Cousin was told that Mr. Cousin had cancer and there was nothing they could do because there were abscesses in his heart and lungs. Mr. Cousin was then taken to Semper Care Hospital. Becky Cousin took pictures of the rash on Richard Cousin's legs.

12. Once Richard Cousin was seen by Dr. Waref Azmeh, an infectious disease specialist, he was diagnosed with a staph infection due to exposure to methicillin-resistant *staphylococcus aureus* (MRSA or Staph). Richard Cousin's discharge diagnosis on October 5, 2004 was tricuspid valve

endocarditis, bacteremia with secondary sepsis and metastatic abscesses of the lungs. Mr. Cousin was, in total, hospitalized for approximately three weeks in intensive care and required extended acute care for additional weeks. Mr. Cousin was administered antibiotics for eight weeks and home health care was provided on at least two occasions.

13. Mr. Cousin was immobile during his treatment and was instructed by his treating physicians to remain indoors due to his weakened immune system. Dr. Waref Azmeh testified that Mr. Cousin suffered from: (1) an overwhelming staph infection throughout his body; (2) endocarditis, which is an infection in the heart; and (3) metastatic lesions on his lungs as well as symptoms of pneumonia. Dr. Azmeh also stated that Mr. Cousin's condition had a 30 percent mortality rate.

14. During Mr. Cousin's treatment, he was administered medication through a peripherally inserted central catheter (PICC line).[3] Dr. Azmeh testified that certain risks are associated with the use of a PICC line.

15. Mr. Cousin testified that he felt pain when riding in vehicles. He further testified that he felt a burning sensation when the drugs were administered through the PICC line. Even several months after the PICC line was

---

[3] A peripherally inserted central catheter (PICC line) is a form of intravenous access that can be used for a prolonged period of time. A PICC line is inserted in a peripheral vein, and then advanced through increasingly larger veins, toward the heart until the tip rests in the superior vena cava (a vein that carries deoxygenated blood from the upper half of the body to the heart's right atrium).

removed, Mr. Cousin continued to take oral antibiotics and pain medication. Dr. Azmeh also testified that certain other difficulties, such as considerable trouble breathing, are associated with the condition. Dr. Azmeh further testified that Mr. Cousin was lucky to have survived.

16. Mr. Cousin testified that he was confined to his home during the holiday season. This included Thanksgiving and Christmas of 2004.

17. Mr. Cousin testified that, during the period when he was treated for the illness, he received $400 a week in workers compensation. He testified that he was unable to work during the months of September, October, November, and December of 2004 and most of January 2005. Mr. Cousin returned to work under light duty status on January 29, 2005. During the relevant period, Mr. Cousin was paid $15.50 dollars an hour at Cane Equipment.

18. Ms. June Pinsonat, an employee at Cane Equipment, testified that Mr. Cousin was employed by Cane Equipment during the relevant times of this case. Mr. Cousin normally worked overtime during the "sugar cane harvesting period" which is from late September to January. This is a period when diesel mechanics are needed on-site more frequently. Ms. Pinsonat testified that Mr. Cousin's average overtime hours during a typical harvesting period would be 10 to 15 hours every other week or at least 5 to 7 hours per week. Due to Mr. Cousin's injuries, he could not work the

customary 10 to 15 hours of overtime every other week during the harvesting period of 2004. However, no overtime would have been claimed for the month of January 2005. Mr. Cousin's payment for overtime was approximately $23.25 per hour.[4]

19. Mr. Cousin testified that he was also unable to spend time with his children during this time. Due to his weakened immune system, Mr. Cousin claims that he was unable to take his children deer hunting and enjoy all of the activities he would normally enjoy with his children. Becky Cousin discussed the hardships she and her children endured because of Mr. Cousin's illness and medical treatment. Becky Cousin testified that Mr. Cousin could not feed himself, clean himself, or otherwise care for himself during this period. On one occasion, she stated that she could not assist Mr. Cousin in climbing out of the bathtub and had to call his father to assist her.

20. Mr. Cousin revealed, at trial, that he has developed permanent scarring along his feet and ankles as a result of the infection.

21. Becky Cousin is the wife of Richard Cousin. Richard Cousin and Becky Cousin are the biological parents of Nicholas Cousin and Alex Cousin.

---

[4] According to Plaintiffs' calculations, Plaintiffs' five (5) hours of overtime per week would amount to $116.25 per week in overtime wages (i.e. 23.25 per hour) (doc. 58, at 9).

22. Richard Cousin sustained the staph infection and associated damages as a result of the injections he received at River West Medical Center on September 7, 2004.

23. The Court finds that there has been more than sufficient evidence that the MRSA infection was caused by an instrumentality within the actual or constructive control of Defendant, River West Medical Center.

## CONCLUSIONS OF LAW

### A. JURISDICTION

The Court's jurisdiction over this matter is based upon diversity of citizenship, 28 U.S.C. § 1332 as conferred by 28 U.S.C. § 1441 et seq. having been removed from the 18th Judicial District Court Parish of Iberville, State of Louisiana by Defendant herein.[5] Plaintiffs, Richard Cousin and Becky Cousin both individually and on behalf of their minor children, Nicholas Cousin and Alex Cousin ("Plaintiffs") and Defendant, River West, L.P. d/b/a River West Medical Center ("Defendant"), are domiciled in different states,[6] and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

---

[5] On March 19, 2007, Plaintiffs filed suit in the 18th Judicial District Court, Parish of Iberville, State of Louisiana to recover damages, naming River West, L.P. d/b/a River West Medical Center and Pat Hill, Registered Nurse, as Defendants. Because the amount in controversy exceeds $75, 000.00 exclusive of interest and costs, this Court was vested with jurisdiction pursuant to Title 28 U.S.C. § 1332 once the only non-diverse Defendant, Pat Hill, was dismissed from this action on July 17, 2007 (doc. 1, at 2).

[6] The Cousins are Louisiana citizens. During the period alleged and at the commencement of this suit, Defendant, River West, L.P. d/b/a River West Medical Center was a Delaware Limited Partnership. Its general partner was Community GP Corporation, a corporation organized and incorporated under the laws of Delaware, with its principal place of business in Tennessee. Its limited partner was Community LP Corporation, also a corporation, organized and incorporated under the laws of Delaware, with its principal place of business in Tennessee. There were no other partners in the limited partnership making

## B. LIABILITY

On March 31, 2011, the Court found that, in light of the unopposed Motion for Summary Judgment and uncontroverted facts established therein, Defendant was liable under the doctrine of *res ipsa loquitur* (doc. 46). Accordingly the Court further found that Plaintiff, Richard Cousin sustained the methicillin-resistant *staphylococcus aureus* (MRSA or Staph) infection and associated damages, as a result of the injections received at River West Medical Center on September 7, 2004, and that the infection was caused by an agency or instrumentality within the actual or constructive control of Defendant.

Therefore, because Defendant has not shown that there is a genuine dispute as to any material fact; Plaintiffs are entitled to summary judgment on the issue of liability in this case as a matter of law. Thus, the only remaining issues for the bench trial pertained to the assessment of damages.

## C. PLAINTIFFS' TESTIMONY AT TRIAL

On March 25, 2013, the following witnesses testified at trial: (1) Richard Cousin, Plaintiff; (2) Becky Cousin, Plaintiff; (3) Dr. Waref Azmeh, M.D., treating physician; and (4) June Pinsonat, Cane Equipment employee.

Plaintiffs presented testimony that Mr. Cousin contracted the staph infection at River West Medical Center as the result of substandard care rendered by emergency room personnel. As such, they alleged damages which

---

up River West, L.P. River West, L.P., was the owner and operator of River West Medical Center, an acute care hospital located in Plaquemine, Louisiana. The hospital was not a juridical entity.

Plaintiffs presented testimony that Mr. Cousin contracted the staph infection at River West Medical Center as the result of substandard care rendered by emergency room personnel. As such, they alleged damages which include: (1) the staph infection, tricuspid valve endocarditis, sepsis, an infection of the heart, and metastatic abscesses to his lungs; and (2) the treatment and related ongoing problems sustained as a result of the breaches of the standard of care by River West employees (doc. 1).

Plaintiffs presented testimony in support of a special damages award. The alleged special damages include: (1) a lost wage claim including overtime compensation; (2) medical bills pertaining to Richard Cousin's treatment for the infection.

Plaintiffs presented testimony in support of a general damages award. The alleged general damages involve "mental or physical pain and suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitively measured in monetary terms." *Duncan v. Kansas City Southern Railway Co.*, 00-0066 (La. 10/30/2000), 773 So.2d 670, 682-83. In addition, Plaintiffs also presented testimony of permanent scarring along Mr. Cousin's extremities.

In addition to the direct claims asserted by Richard Cousin, Plaintiff Becky Cousin testified in support of their loss of consortium claims. The loss of consortium claims are asserted on behalf of Plaintiff Becky Cousin, the wife of

Richard Cousin, and Nicholas and Alex Cousin, the natural children of Richard and Becky Cousin.[7]

## D. CALCULATION OF DAMAGES

Plaintiffs conceded at trial that the damages at issue are difficult to compute with specificity. Plaintiffs contend that as a result of the exposure to and contraction of methicillin-resistant *staphylococcus aureus* (MRSA or Staph) at River West, Richard Cousin has suffered serious personal injury. According to Plaintiffs, Mr. Cousin's injuries have required extensive and ongoing medical care and treatment. Richard Cousin has also missed approximately 20 weeks of work (rounded down). Plaintiffs further aver that the loss of consortium claims asserted by Mrs. Cousin and the children are also difficult to compute with specificity.

Considering the trial testimony coupled with related exhibits, the Court finds that the following damages are supported by the evidence:

1. Loss of Past Wages

   At trial Plaintiffs' witnesses testified to the following:

   | | |
   |---|---|
   | Duration absent from work: | Approximately September 6, 2004 until January 26, 2005 or twenty (20) weeks. |
   | Mr. Cousin's hourly work rate: | $15.50 per hour. |

---

[7] These are derivative claims and are not separate for purposes of the Louisiana Medical Malpractice Act since they flow from the same act of malpractice.

| | |
|---|---|
| Average wages per week: | 650.00 per week.[8] |
| **Total regular lost wages:** | **$13,000.00** |
| Duration of Sugar cane harvesting period[9]: | Approximately Late September 2004 until early January 2005 or seventeen (17) weeks. |
| At least five (5) hours a week of overtime would have been worked: | $116.25 per week in overtime wages |
| **Total overtime lost wages:** | **$1,976.25** |
| Duration of workers compensation: | Approximately September 6, 2004 until January 26, 2005 or twenty (20) weeks. |
| Workers compensation rate: | $400 per week. |
| **Total workers compensation wages received:** | **$8,000.00** |
| **Total lost wages claim minus amount paid in workers compensation benefits:** | **$6,976.25** |

---

[8] Although $15.50 per hour, for 40 hours a week, amounts to $620 per week, Plaintiffs aver that Mr. Cousin's average wages per week amounts $650.00 per week.
[9] The sugar cane harvesting period is the period in which Richard Cousin and other diesel mechanics work consistent overtime and are needed on-site more frequently.

2. Past Medical Expenses:

   At trial, documentation of the following medical bills was entered into evidence:

   | | |
   |---|---|
   | Lake Ascension Physicians<br>October 12, 2004 office visit fee: | $73.00 |
   | Lake Ascension Physicians<br>July 6, 2005 office visit fee: | $73.00 |
   | River West Medical Center<br>September 7, 2004 office visit<br>(includes: x-ray, emergency room,<br>and lortab prescription): | $1,174.37 |
   | 13 visits to Dr. Waref Azmeh, M.D.<br>(September 21, 2004 through<br>December 4, 2004): | $1,690.00 |
   | Semper Care Baton Rouge<br>Hospital stay<br>(September 24, 2004<br>through October 5, 2004): | $34,457.55 |
   | Our Lady of the Lake Regional<br>Medical Center Hospital stay<br>(September 20, 2004<br>through September 24, 2004): | $26,237.15 |
   | Store-bought prescriptions for<br>antibiotic treatment and pain<br>(September 7, 2004 through<br>April 16, 2007): | $273.31 |
   | 5 visits to Dr. Charles P. Bolotte, MD<br>(December 12, 2005<br>through May 16, 2008): | $582.00 |
   | **Total past medical expenses award:** | **$64,560.38** |

3. General Damages:

The Court finds that the evidence and testimony presented at trial support a general damage award in this case. The Court carefully considers the following facts in determining this award: (1) the considerable anxiety during life-threatening situations; (2) the duration of Mr. Cousin's hospitalization (approximately three weeks) and home care (approximately five weeks); (3) the extensive and painful treatment Mr. Cousin underwent including a prolonged intravenous antibiotic therapy through the use of a PICC line; (4) the infection in his heart and abscesses in his lungs; and (5) some permanent scarring along his lower extremities.

**Total general damages award:** **$200,000.00**[10]

---

[10] Three court cases support the Court's decision for this award. First, Mr. Cousin's case has basic facts similar to the *Arbourgh* case. *Arbourgh v. Sweet Basil Bistro, Inc.* 98-2218 (La. App. 4 Cir. 5/19/99), 740 So. 2d 186, 195 writ denied, 99-2942 (La. 12/17/99), 751 So. 2d 883. In *Arbourgh*, a general damages award of $88,256 was considered high but not excessive for parents whose child developed a severe and deadly infection due to food poisoning which progressively worsened during hospitalization (seven days). *Id.* Here, Mr. Cousin's case involved a life-threatening infection, a longer period of hospitalization (three weeks) and treatment, and severe pain. Mr. Cousin's damage award must be adjusted upward from $88,256 significantly when comparing the pain and extensive and sometimes painful treatment he underwent for a significantly longer period of time. A jury award of $125,000 in damages was not an abuse of discretion in *Holtzclaw v. Ochsner Clinic, P.C.*, when: (1) a patient sustained a perforated intestine after a colonoscopy (worsened by nurse's negligence); (2) the patient was hospitalized for three days because of a bowel blockage, and he spent another 12 days in the hospital during the reversal procedure; and (3) in the twelve years since the surgeries, the patient had six incidents of bowel blockages, three of which required hospitalization. 02-555 (La. App. 5 Cir. 10/29/02), 831 So. 2d 495, 497. Here, Mr. Cousin's case is similar to the *Holtzclaw* case because both cases involve a hospital's negligent acts, both patients developed a severe infection, and both patients had similar periods of hospitalization. While Mr. Cousin has not required further hospitalization in the last eight years, unlike Holtzclaw, his award must still be adjusted upward from $125,000. Once again, Mr. Cousin's additional five weeks of intravenous antibiotic treatment, even after his three weeks of hospitalization, show a longer period of recovery and consistent anxiety during this life-threatening period. Finally, Mr. Cousin's circumstances are most like those found in the *Howell* case. *Howell v. Iacona*, 505 So. 2d 821, 829 (La. Ct. App. 1987). In *Howell*, an award of $100,000 was considered a reasonable sum to compensate for past and future pain and emotional suffering, and permanent scarring after a patient developed a staph infection after heart surgery. The patient suffered great anxiety during the potentially life-threatening situations, was hospitalized for approximately 80 days, he underwent three operations, a subpectoral insertion, an unsuccessful attempt to remove leads, a sternum splitting thoracotomy, and prolonged intravenous antibiotic therapy. His family testified that he had become withdrawn and deeply depressed as a result of all the complications. *Id.* Here, while Mr. Cousin suffered the same infection, some similarities in the circumstances, a substantially similar period of hospitalization when combined with home treatment, some similarity in the extent of treatment, and some scarring, the award must nonetheless be adjusted upward from $100,000. Also, *Howell* was decided in 1987, and the award of $100,000 must be adjusted for inflation.

4. Loss of Consortium:

The Court finds that the evidence and testimony presented at trial supports the following loss of consortium awards:

| | |
|---|---|
| Becky Cousin's loss of consortium claim: | $25,000.00[11] |
| Nicolas Cousin's loss of consortium claim: | $25,000.00 |
| Alex Cousin's loss of consortium claim: | $25,000.00[12] |
| **Total loss of consortium claims award:** | **$75,000.00** |

---

[11] The Court finds that the evidence supports a loss of consortium award of $25,000.00 for Becky Cousin. The case of *Bellard v. South Central Bell Telephone Company* demonstrates a similar award under similar facts. App. 3 Cir.1997, 702 So.2d 695, 1996-1426 (La. App. 3 Cir. 8/27/97), writ denied 704 So.2d 1202, 1997-2415 (La. 12/12/97). In that case, the court issued an award of $25,000 in damages for loss of consortium to a husband of a passenger who suffered multiple injuries, including a broken leg and broken hip, in an automobile accident. The husband testified that the "wife was helpless" after being released from the hospital and was bedridden for approximately two months. He testified further that, after the accident, the wife was less active in caring for children or performing household tasks due to her injuries, and the "wife's pain had affected their personal life and put a damper on everything they did." *Id.* Here, both Mr. and Mrs. Cousin testified: (1) Mr. Cousin was unable to work during the months of September through January of 2005; (2) Mr. Cousin was confined to his home during the holiday season, including Thanksgiving and Christmas of 2004 due to his weakened immune system; (3) Mr. Cousin could not feed himself, clean himself, or otherwise care for himself during this period, and on one occasion, Mrs. Cousin stated that she could not assist Mr. Cousin in climbing out of the bathtub and had to call his father to assist her; and (4) even after his recovery from his illness, he stayed on prescription medication, he has not been able to do things with his family as he once did, and still has trouble breathing.

[12] The Court finds that the evidence supports a loss of consortium award of $25,000.00 for Alex and Nicolas Cousin, respectively. The case of *Pryor v. United Services Automobile Association* demonstrates a similar award under similar facts. App. 4 Cir.1999, 729 So.2d 658, 1998-1371 (La. App. 4 Cir. 2/10/99), writ denied 741 So.2d 16, 1999-0686 (La. 4/30/99), writ denied 741 So.2d 17, 1999-0701 (La. 4/30/99). In that case, the evidence supported loss of consortium awards of $25,000 each for an injured driver's three children. There, both the driver and her husband testified that the relationship between the driver (mother) and her sons had suffered greatly after the accident. *Id.* Here, while Plaintiffs do not argue severe long-term damage to the relationships Mr. Cousin has with his two sons, there is evidence that their relationship was severely strained throughout Mr. Cousin's illness, recovery, and thereafter. Mr. and Mrs. Cousin testified that: (1) Mr. Cousin was unable to spend time with his children during the illness and was unable to take his children deer hunting and enjoy all of the activities he would normally get to enjoy due to his weakened immune system; (2) the children were "scared to be around daddy" while he was in the hospital and at home and actively stayed away from him throughout his illness for fear that they would get sick; (3) Mrs. Cousin testified that she and the children had to constantly clean all utensils and areas where Mr. Cousin had been in the home fearing that the infection might spread; and (4) both children exhibited emotional effects throughout their father's illness and that the younger of the two children in particular could not understand why his father was isolated for such an extended period of time.

## E. CONCLUSION

The Court finds by a preponderance of the evidence that the evidence and testimony presented at trial supports a total damages award of $346,536.63.

| | |
|---|---|
| Total lost wages award minus amount paid in workers compensation benefits | $6,976.25 |
| Total past medical expenses award | $64,560.38 |
| Total general damages award | $200,000.00 |
| Total loss of consortium claims award | $75,000.00 |
| **Total damages award** | **$346, 536.63** |

Judgment in accordance with the foregoing findings of fact and conclusions of law is so ordered.

Baton Rouge, Louisiana, May 21, 2013.

_____
BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA